Darryl MORRIS and Leggitt Nailor,
Plaintiffs–Appellants,

v.

OFFICE MAX, INC., Defendant–Appellee.

No. 95–3422.

United States Court of Appeals,
Seventh Circuit.

Argued April 23, 1996.

Decided July 12, 1996.

Kenneth N. Flaxman (argued), Lesley A. Redman, Chicago, IL, for Plaintiffs-Appellants.

John E. Farrell (argued), Jason C. DeSanto, Freeborn & Peters, Chicago, IL, for Defendant-Appellee.

Before FLAUM, MANION, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Within minutes of entering an Office Max store to purchase office supplies, Darryl Morris and Leggitt Nailor were approached by police officers who had been summoned by the store's assistant manager to investigate two black males purportedly acting suspiciously. The only two black men in the store at the time, Morris and Nailor, showed identification and answered questions posed by the officers, who then apologized and left. As a result of the incident, this case was filed, in which it is alleged that the only reason Office Max called the police was that Morris and Nailor are African–Americans. The men claim that the store's actions interfered with their right to "make and enforce" a contract in violation of 42 U.S.C. § 1981 and impaired their ability to purchase personal property in violation of 42 U.S.C. § 1982. The district court granted summary judgment for Office Max, and this appeal followed.

The undisputed facts reveal that at 8:48 p.m. on October 24, 1994, just minutes before

the 9 o'clock closing time, Morris and Nailor entered the Office Max store in the Orland Towne Center in Orland Hills, Illinois. Both men had shopped at the store before. Morris, in fact, had shopped at various Office Max stores approximately 35 times. This time, they had come to the store to purchase telephone message pads.

They state that despite the fact that they were conservatively dressed[1]—presumably like most Office Max customers—their entrance drew the attention of store personnel. At 8:49 p.m., the assistant store manager, Kathleen Donley, telephoned the Orland Hills Police Department to report "two male blacks acting suspiciously." The police department immediately dispatched two police officers (they were actually in the area at the time) to the store. According to her deposition testimony, Donley observed that the front door was propped open after the men entered the store and that they were not walking together. She said that the men vaguely matched the description of individuals who reportedly passed a bad check and stole a laptop computer from another store. Donley claimed that whenever she noticed patrons acting suspiciously, she customarily asked police to walk through the store to deter problems.

In the meantime, Morris was looking for telephone message pads. A store clerk directed him to the proper location, and Morris picked up several pads. While Morris was paying for the items, Nailor continued to walk around the store. After making his purchases, Morris rejoined Nailor, and the two began to examine time-stamp machines.

By this time, two uniformed police officers arrived at the store. Donley directed the officers toward the two men. When the officers approached, Nailor asked if there was a problem. One of the officers responded that they had received a report that two black men were loitering in the store. Morris told the officers that he and Nailor were the only two black persons in the store and that they were not loitering. According to Morris' de-

position testimony, one of the officers said that the store had "been having a problem with black people coming in near closing and taking computers out and other supplies." In response to the officers' questions, the men produced their drivers licenses. Morris recalled that one of the officers then apologized, stating that "it was not our fault ... management called us and we didn't know what to expect." According to Nailor's deposition testimony, one of the officers said, "[G]uys, unfortunately you are guilty by association." As the officers left the store, Morris overheard one of them tell Donley that "these two are okay."

Morris complained to Donley that she had called the police only because he and Nailor were African–American. Donley responded that she had asked the police to come to the store because the store had been experiencing thefts by customers entering the store at night shortly before closing.

Morris and Nailor filed this action in November 1994, alleging that Office Max denied them "the freedom to buy whatever a white man can buy." They alleged that Office Max discriminated against them on the basis of race in violation of 42 U.S.C. §§ 1981 and 1982 and that as a result of Office Max's wrongful acts, they were subjected to badges and incidents of slavery, embarrassed, humiliated, and subjected to severe emotional distress.

The district court granted Office Max's motion for summary judgment in September 1995. The court found that the plaintiffs failed to produce any evidence to suggest that Office Max interfered with their right to make further purchases or to enter into a retail contract.

We review a grant of summary judgment *de novo*, drawing all reasonable inferences in favor of the nonmoving party. *Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 173 (7th Cir.1996). Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

---

1. We will avoid being sidetracked by a lengthy discussion of whether it is wise or enlightened for a store to treat customers differently based on the way they are dressed. Were we so side-

tracked, we might wonder what Morris and Nailor are really arguing. Would what Office Max did be more acceptable if they were wearing purple hats or pink leisure suits?

Federal Rule of Civil Procedure 56. Where the party opposing a motion for summary judgment bears the burden of proof on an issue at trial, that party must go beyond the pleadings and affirmatively establish a genuine issue of material fact. *Bratton*, 77 F.3d at 173.

In this case, although Morris and Nailor say that the case should be remanded for trial, thus implicitly arguing that there are disputed issues of material fact precluding the grant of summary judgment, their real argument is about, as they phrase it, "whether there is a federal remedy under either 42 U.S.C. Section 1981 or 42 U.S.C. Section 1982 when a store summons the police to 'check out' patrons simply because the patrons are African–American. . . ." Specifically, they claim on appeal that the district court erred in granting summary judgment because (1) §§ 1981 and 1982 provide federal remedies for patrons who have been discriminated against on the basis of race while making a prospective purchase in a retail setting, and (2) a triable issue exists whether Office Max's actions deprived them of their property interest in prospective contractual relations.

Section 1981 addresses racial discrimination in contractual relationships. As amended by the Civil Rights Act of 1991, the statute reads in relevant part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . .

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(a)-(c).

Litigation involving § 1981 most commonly involves the right to make and enforce contracts of employment. *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). Claims involving retail transactions have been infrequent. Patrons have, however, brought suits under § 1981 for refusal of service, *see Washington v. Duty Free Shoppers, Ltd.*, 710 F.Supp. 1288 (N.D.Cal.1988); *Shen v. A & P Food Stores*, No. 93 CV 1184(FB), 1995 WL 728416 (E.D.N.Y. Nov. 21, 1995); for removal from the store, *Flowers v. The TJX Companies*, No. 91–CV–1339, 1994 WL 382515 (N.D.N.Y. July 15, 1994); and for a store practice of recording the race of all customers paying by check, *Roberts v. Walmart Stores, Inc.*, 769 F.Supp. 1086 (E.D.Mo.1991).

Section 1982 deals with discrimination in property transactions. It states:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. Section 1982 was enacted to enable Congress to enforce the Thirteenth Amendment and, particularly, to prohibit all racial discrimination, private and public, in the sale and rental of property. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968).

Both §§ 1981 and 1982 derive their operative language from the first section of the Civil Rights Act of 1866. Because of their common origin and purpose, § 1981 and § 1982 are generally construed in tandem. *See Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 440, 93 S.Ct. 1090, 1095, 35 L.Ed.2d 403 (1973); *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210–11 (7th Cir.1984).

■ To establish a claim under § 1981, the plaintiffs must show that (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract). *See Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir. 1994); *Mian v. Donaldson, Lufkin & Jen-*

*rette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993).

■ Morris and Nailor cannot establish the third element, nor can they raise a genuine issue of material fact which would preclude the grant of summary judgment. They cannot point to specific facts showing that Office Max deprived them of any of the enumerated rights in § 1981 and, specifically, the right to make and enforce a contract. They were denied neither admittance nor service, nor were they asked to leave the store. *See Robertson v. Burger King, Inc.,* 848 F.Supp. 78, 81 (E.D.La.1994) (dismissing claim where "plaintiff was not denied admittance or service"); *Stearnes v. Baur's Opera House, Inc.,* 788 F.Supp. 375, 378 (C.D.Ill. 1992) (granting summary judgment against black patron of dance bar who failed to provide any evidence that the manager "refused Plaintiff *admittance* to the bar or *service* while he was there"); cf. *Watson v. Fraternal Order of Eagles,* 915 F.2d 235, 243 (6th Cir.1990) (allegations by black guests at party held in fraternal club that club asked them to leave in order to avoid having to sell them soft drinks stated actionable claim under § 1981).

In fact, the men concede that Office Max did not refuse them admittance or service. They press another argument, however—namely, that Office Max deprived them of their right to purchase merchandise by interfering with their "prospective contractual relations." They focus on one particular prospective contract—a purchase of time stamps that they were examining when confronted by the police. They do not assert, however, that Office Max refused to sell them the items; rather, they contend that by summoning the police to "check out" African–American patrons like themselves, the store discouraged and dissuaded them from making the purchase.

As an initial matter, they have adduced little evidence concerning a prospective purchase of time stamps. Although they assert that the encounter with the police caused them to "los[e] interest" in the time stamps, they produced no evidence to suggest that they had anything more than a general interest in that merchandise. The only evidence of even a general interest is the following from Nailor's deposition:

Q: When did you have the conversation about the time stamp?

A: Probably a few days before [the incident at Office Max].

. . . .

A: I was showing [the time stamps] to [Morris]. And we were discussing the advantages and disadvantages of about three or four models there.

■ Moreover, the men failed to demonstrate that they would have attempted to purchase the time stamps even if they had not been approached by the police. The situation is similar to that in *Jackson v. Tyler's Dad's Place, Inc.,* 850 F.Supp. 53 (D.D.C.1994). There, two African–American plaintiffs claimed that they were refused tables at a restaurant based on their race. When they entered the restaurant, they were told that the dining room was fully reserved, but that they were welcome to eat at the bar. They declined and left. They then called the restaurant, and this time were informed that tables were available. They returned to the restaurant and complained about being turned away earlier, but they did not attempt to sit and order. The court rejected the claim of race discrimination and granted summary judgment in favor of the restaurant: because plaintiffs "never asked to be seated during the second visit," they "never sought to enter a contractual relationship on that occasion." *Id.* at 56 n. 6; *see also White v. Denny's Inc.,* 918 F.Supp. 1418, 1425 (D.Co.1996); *Bray v. RHT, Inc.,* 748 F.Supp. 3, 5 (D.D.C.1990), *aff'd,* 976 F.2d 45 (D.C.Cir. 1992).

Similarly, because they did not attempt to make any further purchases, Morris and Nailor never sought to enter into a contractual relationship with Office Max. Their allegation that Office Max interfered with their "prospective contractual relations" is speculative and insufficient to state a claim under § 1981. A claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future con-

tract opportunities. *See Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262 (10th Cir.1989).

The § 1982 claim fails for similar reasons. Morris and Nailor cannot show that Office Max's conduct impaired their ability to exercise property rights—even assuming that an implicit retail contract is a property right. The statute protects the ability of citizens to "inherit, purchase, lease, sell, hold, and convey ... personal property." For the reasons discussed above, the men cannot demonstrate that they were denied the right to purchase personal property. Although the incident understandably may have discouraged them from patronizing the store, nothing that the police or Office Max personnel did actually impaired or interfered with their right to make a purchase.

While the incident that Morris and Nailor experienced was unfortunate and undoubtedly disconcerting and humiliating, it does not constitute a violation of the statutes. We therefore affirm the district court's grant of summary judgment in favor of Office Max.