Daron HILL, Tyson Parks, Christopher M. Lawson, and Carlton Reives, on behalf of themselves and others similarly situated, Plaintiffs,

v.

SHELL OIL COMPANY and Equilon Enterprises, LLC; Shahid Hasan, individually and d/b/a Ashland and Diversey Shell; Beyer Enterprises, Inc., d/b/a Ridge Devon Shell; Clark Devon Shell, Inc.; Mohammed Anjad Umer, individually and d/b/a Peterson Western Shell; John Zyung, individually and d/b/a Roselle Shell; and Gio, Inc. d/b/a Westchester Shell and Car Wash, on behalf of themselves and others similarly situated, Defendants.

No. 98 C 5766.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 29, 1999.

Thomas R. Meites, Michael M. Mulder, Paul William Mollica, Meites, Mulder, Burger & Mollica, Chicago, IL, for plaintiffs.

Steven Francis Molo, Gerald C. Peterson, Norman K. Beck, Winston & Strawn, Chicago, IL, Manuel Sanchez, John Scott Huntley, Daniel Thomas Grosso, Sanchez & Daniels, Chicago, IL, George B. Collins, Christopher Robert Bargione, Adrian M. Vuckovich, Collins & Bargione, Chicago, IL, Joseph Michael Gagliardo, Gregory Robert James, Jr., Clifford Raymond Perry, III, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, IL, Robert Joseph Meyer, Sheryl A. Pethers, Debrai G. Haile, Swanson, Martin & Bell, Chicago, IL, Cary S. Fleischer, Alan R. Dolinko, Jeralyn Hartwick Baran, Chuhak & Tecson, Chicago, IL, Brett G. Rawitz, Josh Michael Friedman, Bates, Meckler,

Bulger & Tilson, Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiffs bring this lawsuit as a purported class action on behalf of all African–American customers of Shell-brand gas stations. They allege that, in Chicagoland and across the nation, Shell-brand gas stations require African–Americans to pre-pay for gasoline while allowing white customers to pay after pumping gas. Plaintiffs claim that this pattern or practice of racial discrimination violates their federally-protected civil rights. Defendants move to dismiss the complaint on a variety of grounds. For the reasons set forth below, defendants' motions are granted in part and denied in part.

## BACKGROUND

### I. Factual Background

Daron Hill ("Hill"), Tyson Parks ("Parks"), and Christopher M. Lawson ("Lawson") (collectively "plaintiffs") are African–American customers of Shell-brand gasoline.[1] Most Shell-brand gas stations are equipped with gas pumps that can be turned on or off from a console inside the service station. Customers can be viewed by the operator of the station through a window or video camera. Plaintiffs allege that they were required to pay in advance for gasoline before the operator of the station would turn on the pump ("pre-pay"). White customers arriving within minutes of such incidents, however, were allowed to pump their gas first and then pay ("post-pay"). Plaintiffs claim

that this racially discriminatory treatment violated their rights under 42 U.S.C. §§ 1981, 1982, and 2000a.

Defendant Shell Oil Company ("Shell") is a Delaware corporation doing business in this district. Until 1998, Shell owned approximately 8,500 gas stations located throughout the United States. On or after January 1, 1998, Shell transferred ownership of the approximately 8,500 stations and related assets to defendant Equilon Enterprises, LLC ("Equilon"). Approximately 10 percent of the stations are owned and operated directly by Shell or Equilon ("corporate stations"). The remaining 90 percent of the stations are owned by Shell or Equilon but operated by individual contract dealers ("dealer stations"). The dealer stations operate under a dealer agreement ("agreement") with Shell and Equilon, and lease the stations from Shell and Equilon under a "Motor Fuel Station Lease" ("lease"). The Agreement requires dealer stations to maintain corporate standards in the operation of Shell-brand stations (agrmt, ¶ 2). The agreement and the lease also provide for termination by Shell or Equilon if a dealer station knowingly fails "to comply with federal, state or local laws or regulations relevant to the operation of [the station]" (agrmt, ¶ 18.1(c)(11); lease, ¶ 10.1(c)(10)).

Plaintiffs allege that they were subject to discrimination at both corporate and dealer stations. Specifically, the complaint details a total of twelve pre-pay incidents at two corporate and six dealer stations across Chicagoland.[2] It also describes incidents at five other stations located in

---

1. On a motion to dismiss we take plaintiffs' well-pleaded factual allegations as true and construe them in their favor. *See Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir.1992).

2. Defendants' motions to dismiss are directed at plaintiffs' second amended complaint, which was filed on January 27, 1999. On August 18, 1999, plaintiffs filed a third amended complaint, adding Carlton Reives as a plaintiff and Bruce Sirichio d/b/a Westchester Shell Car Wash as a defendant. On Sep-

tember 15, 1999, plaintiffs filed a fourth amended complaint, substituting Gio, Inc. as the correct owner of Westchester Shell Car Wash. While we do not discuss the incident at Westchester in the fact portion of the opinion, the rulings set forth in this opinion with respect to the six other dealer stations apply equally to Westchester. Because Westchester has not had the opportunity to respond to the complaint against it, however, we reserve our right to entertain a motion to dismiss from Westchester if one is filed in the future.

metropolitan areas outside Illinois. With respect to the incidents occurring in Illinois, plaintiff Hill was required to pre-pay on September 21, 1997, at a Shell corporate station in Skokie. He was also required to pre-pay at the following dealer stations on the following dates: Ashland Diversey Shell on February 6, 8, and 10, and August 3, 1997; Peterson Western Shell on August 3 and September 7, 1997; Ridge Devon Shell on August 3, 1997; Irving Sheridan Shell on September 7, 1997; and Clark Devon Shell on September 21, 1997. Plaintiff Lawson was required to pre-pay on January 10, 1998, at an Equilon-operated station in Lombard. Plaintiff Parks was required to pre-pay on June 7, 1998, at Roselle Shell.[3]

Based on these Illinois incidents, plaintiffs name as defendants in this lawsuit Shell, Equilon and the six dealer stations identified above. Unless otherwise noted, we shall refer to the six dealer stations collectively as "dealer defendants," and individually as Ashland Diversey Shell, Irving Sheridan Shell, Ridge Devon Shell, Clark Devon Shell, Peterson Western Shell, and Roselle Shell.

## II. History of Proceedings

Plaintiffs have made numerous submissions to the Illinois Department of Human Rights ("IDHR") complaining of these discriminatory pre-pay incidents. As we will discuss below, the substance and chronology of these filings are important. On February 24, 1998, plaintiff Hill filed a charge with the IDHR against Shell for the September 21, 1997 pre-pay incident at the corporate station in Skokie. In that submission to the IDHR, Hill also described the pre-pay incidents he suffered at the five dealer stations with which he had dealings. Shell responded to the charge on April 15, 1998. On June 11, 1998, plaintiff Parks filed an IDHR charge against Roselle Shell based on the pre-pay incident he suffered there on June 7, 1998. On August 18, 1998, Hill filed amended charges, identifying with more specificity

the five dealer stations that required him to pre-pay for gas. On September 16, 1998, plaintiff Hill withdrew his IDHR charges and filed a complaint, naming Shell and five dealer stations as defendants. On September 23, 1998, Hill filed the first amended complaint, which added Parks as a plaintiff and Equilon and Roselle Shell as defendants.

Plaintiffs filed a new round of IDHR charges on December 10, 1998. In addition to the charges of Hill and Parks against Shell and the six dealer defendants, Lawson filed charges against Equilon for the January 10, 1998 pre-pay incident he suffered at the corporate station in Lombard. The December 10, 1998, filings were formal IDHR charges, naming as respondents each of the eight defendants. In a letter to plaintiffs' counsel dated December 28, 1998, an IDHR investigator informed plaintiffs that their charges were filed more than 180 days after the alleged incidents and therefore were untimely under Illinois law. On January 27, 1999, plaintiffs filed the second amended complaint ("complaint") against Shell, Equilon and the six dealer defendants.

In the complaint, plaintiffs purport to bring a bilateral class action on behalf of "all African–American persons who have purchased gas at or will in the future seek to purchase gas from Shell and Equilon corporate locations or contract dealers" (cplt, ¶ 13) They name Shell, Equilon and the six dealer stations as defendants, along with a defendant class consisting of "all Shell and Equilon contract dealers operating under Shell and Equilon's Lease and Dealer Agreement" (cplt, ¶ 18). Plaintiffs raise two counts in their complaint, both based on the same discriminatory pre-pay incidents. Count I is brought under Sections 1981 and 1982 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991. 42 U.S.C. §§ 1981 and 1982. Count II is brought under Title II of the Civil Rights Act of 1964. 42 U.S.C. § 2000a. Plaintiffs allege that defendants

---

**3.** Plaintiff Reives was required to pre-pay on April 29, 1999 at Westchester Shell.

have maintained a pattern or practice of requiring African–American customers, but not white customers, to pre-pay for gas purchases. Plaintiffs allege that Shell and Equilon are liable for the misconduct of their corporate stations, and of the dealer stations, over whom they have actual or apparent authority. Plaintiffs seek monetary damages, injunctive relief, attorneys' fees, and a declaration against defendants establishing that Shell and Equilon have the power under the agreement and the lease to terminate any dealer station discovered to have violated federal civil rights laws against members of the plaintiff class.

All eight defendants have moved to dismiss the complaint. Defendants primarily argue that 1) Count II should be dismissed because plaintiffs have failed to satisfy the jurisdictional prerequisites of Title II, and 2) both counts should be dismissed for failure to state a claim. In addition, various defendants advance a number of other grounds for full or partial dismissal, including arguments of vicarious liability, mootness, standing, and misjoinder. As discussed below, the motions to dismiss are granted in part and denied in part.

## DISCUSSION

### I. Subject Matter Jurisdiction Over Title II Claim

Defendants move to dismiss plaintiffs' Title II claims under Rule 12(b)(1) for lack of subject matter jurisdiction. Where a Rule 12(b)(1) motion challenges the sufficiency of the allegations of subject matter jurisdiction, the court must accept as true all well-pleaded factual allegations and construe them favorably to the pleader. *Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir. 1993). Dismissal is proper only if it appears beyond doubt that the plaintiff cannot prove any set of facts consistent with the complaint that would entitle him to the relief requested. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Defendants claim that plaintiffs have failed to satisfy Title II's jurisdictional requirements before filing this lawsuit. *See* 42 U.S.C. § 2000a–3(c). First, defendants argue that plaintiffs failed to meet the 30–day state notice requirement contained in § 2000a–3(c). Second, defendants argue that plaintiffs failed to initiate IDHR proceedings within the 180–day state filing period allotted under Illinois law (*see* 775 ILCS 5/7A–102(A)(1)), and therefore their Title II claims are barred. Both of these arguments fail.

### A. Title II's State Notice Requirement

Defendants claim that plaintiffs failed to satisfy Title II's jurisdictional prerequisites because they did not file written notice with the IDHR at least 30 days before bringing this lawsuit. Title II contains a state notice requirement, set forth in § 2000a–3(c):

> In the case of an alleged act or practice prohibited by this subchapter which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) of this section before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority.

Because the requirements of § 2000a–3(c) are jurisdictional, failure on the part of plaintiffs to satisfy the 30–day state notice rule would warrant dismissal of their Title II claim for lack of subject matter jurisdiction. *See Stearnes v. Baur's Opera House, Inc.*, 3 F.3d 1142, 1145 (7th Cir.1993).

Plaintiffs raise two arguments in response to this claim. First, they argue that this action falls under § 2000a–3(d), which does not contain any state notice requirement. Second, they contend that even if § 2000a–3(c) applies to their action, they have satisfied the state notice requirement set forth therein. We address each of these arguments in turn.

### 1. Section 2000a–3(d)

■ Plaintiffs emphasize that § 2000a–3(c) applies only where there is "a State or local law prohibiting such act or practice *and establishing or authorizing a State or local authority to grant or seek relief from such practice.*" They argue that the IDHR does not have the authority to grant or seek the interstate class remedy they pursue in this lawsuit. Therefore, they argue, § 2000a–3(c) does not govern this action. Instead, plaintiffs claim to proceed under § 2000a–3(d), which applies to alleged acts or practices occurring in a state "which has no State or local law prohibiting such act or practice," and consequently does not contain any requirement to notify a state agency prior to filing a federal action.

Plaintiffs' position would circumvent § 2000a–3(c)'s state notice rule in all cases in which a plaintiff anticipates seeking interstate, classwide relief. Indeed, under plaintiffs' theory, § 2000a–3(c) would not apply whenever an individual seeks relief from multiple defendants who do not reside in the same state. This would vitiate § 2000a–3(c), which is meant to provide a state agency the opportunity to invoke its remedies. *See Harris v. Ericson,* 457 F.2d 765, 766 (10th Cir.1972). If a plaintiff is not satisfied with the relief available from the state agency, he may proceed with his federal lawsuit after 30 days. This requirement is not an onerous one.

Plaintiffs supply no authority supporting their position that the notice requirement is not applicable when interstate, classwide relief is sought. The only case cited by plaintiffs is *Robinson v. Power Pizza, Inc.,* 993 F.Supp. 1458 (M.D.Fla.1998). In *Robinson,* the court held that § 2000a–3(c) did not require plaintiffs to notify the Florida Commission on Human Relations prior to filing a federal action because plaintiffs sought a preliminary injunction and the Florida Commission provided no mechanism for obtaining such relief. *Id.* at 1460–61. The court's holding in *Robinson,* however, was based on unique concerns of urgency—the court emphasized the injus-

tice of forcing a plaintiff in need of immediate injunctive relief to file a futile notice with the state agency and then wait 30 days before initiating a federal action. *Id.* at 1461. Those considerations of urgency do not exist here, and *Robinson* has little bearing on this case.

Nothing in § 2000a–3(c) indicates that it does not apply in the circumstances presented here, and there is no persuasive case law suggesting otherwise. Indeed, Illinois has established a state agency, the IDHR, to investigate and prosecute just the sort of acts of racial discrimination plaintiffs allege in this lawsuit. Accordingly, we hold that § 2000a–3(c)'s 30–day state notice requirement applies in this lawsuit.

### 2. Section 2000a–3(c)

Having held that § 2000a–3(c)'s 30–day state notice requirement applies to this case, we next turn to the issue whether plaintiffs have satisfied that requirement. Plaintiffs have made numerous submissions to the IDHR and have amended their original complaint in this action a number of times. Based on the date of these filings and the parties named therein, each of the defendants argues that an appropriate charge was not made with the IDHR at least 30 days before it was named in this lawsuit. Such failure to notify the IDHR, they argue, requires dismissal for lack of subject matter jurisdiction.

■ Defendants and plaintiffs have differing interpretations of § 2000a–3(c)'s state notice requirement. Defendants construe § 2000a–3(c) to require that each defendant be named as a respondent in a formal state administrative charge at least 30 days before being joined as a defendant in a federal lawsuit. Plaintiffs, on the other hand, do not read the statute to require formal state administrative charges against each defendant. Plaintiffs argue that informal written notice describing the allegedly discriminatory act or practice is sufficient. We must determine which of these two approaches is correct.

We start with the plain language of the statute. Section 2000a–3(c) simply requires that the appropriate state agency be given "written notice" of the "alleged act or practice" at least 30 days before a federal action is brought. Notably, the statute does not require filing of a state administrative charge against each potential defendant, nor even written notice to each potential defendant—just notice to the state agency. This language reflects the purpose of the statute. Section 2000a–3(c) is meant to provide a state agency with the opportunity to invoke its remedies for discriminatory acts and practices occurring in its jurisdiction. *See Harris,* 457 F.2d at 766. Therefore, the statute is drafted to provide notice to the state agency of the discriminatory incident, irrespective of whether that notice takes the form of a formal charge.

At least one court in this district has interpreted the plain language of § 2000a–3(c) to mean that a plaintiff need only provide written notice of the underlying facts of the dispute to the IDHR at least 30 days before seeking relief in federal court. In *Watkins v. Dave & Buster's, Inc.,* 1996 WL 596405 (N.D.Ill. Oct.10, 1996), plaintiff submitted a written statement to the IDHR describing the allegedly discriminatory incident. Several days later, she filed a formal complaint with the IDHR. More than 30 days after filing the informal statement, but less than 30 days after filing the formal complaint, plaintiff initiated a Title II action in federal court. Judge Hart held that plaintiff had satisfied the state notice requirement because " § 2000a–3(c) only requires that the appropriate agency be given notice of the facts." *Id.* at *3. No formal IDHR is required.[4] *Id.* at *2. That holding seems

to us in keeping with the plain language of the statute.

This construction is further supported by the fact that exhaustion of state administrative remedies clearly is not required under Title II. *See* 42 U.S.C. § 2000a–6(a); *Harris,* 457 F.2d at 766–67. Indeed, as the court in *Watkins* pointed out, § 2000a–3(c) "does not even assume that the complainant will have a right to pursue an individual action" through the state administrative apparatus. *Id.* at *2. *See also Daigle,* 957 F.Supp. at 11 (§ 2000a–3(c) does not require a plaintiff to "file a or to otherwise pursue action under the applicable state anti-discrimination law."). The courts have not placed many strictures on § 2000a–3(c). As the defendants concede, its state notice requirement is modest (Shell reply br., at 15) All that is required is "written notice" of the "alleged acts or practices" constituting the discrimination.

Defendants' position, that each defendant named in a lawsuit must first be named as an individual respondent in a formal IDHR charge, is contrary to the plain language of the statute, the well-reasoned holding of *Watkins,* and the admittedly modest nature of § 2000a–3(c). In support of their argument, defendants rely on one paragraph in *Hornick v. Noyes,* 708 F.2d 321, 323–24 (7th Cir.1983), *cert. denied,* 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984). In *Hornick,* the court dismissed Title II claims against defendants who were discussed in the narrative portion of a timely IDHR charge, but who were never named as formal respondents in that charge.[5] We note that the dismissal of defendants in that case was based on two alternative grounds, only one of which implicated § 2000a–3(c)'s state

---

4. Other courts similarly have held that the notice requirement contained in § 2000a–3(c) does not require a formal state administrative. *See, e.g., Daigle v. Friendly Ice Cream Corp.,* 957 F.Supp. 8, 11 (D.N.H.1997) (holding that plaintiff had satisfied § 2000a–3(c)'s state notice requirement simply by writing a letter to the state attorney general about the discriminatory incident).

5. In contrast, defendants in this lawsuit have been named as respondents in formal IDHR charges, albeit some of those charges were filed after the defendant had been named as a party in this lawsuit.

notice requirement. *Id.* at 323–24. In addition, the court in *Hornick* stated that the claims against the dismissed defendants were moot given the nature of the relief sought, further diminishing the precedential value of the holding. *Id.* at 324. Like the court in *Watkins,* we find *Hornick* devoid of compelling analysis on this issue. *See Watkins,* 1996 WL 596405, at *3 (refusing to follow *Hornick*'s *dicta* regarding § 2000a–3(c)).

We agree with the court in *Watkins* that § 2000a–3(c) requires only written notice of the alleged discriminatory acts or practices. Plaintiffs do not need to file formal complaints with the IDHR naming each defendant as a respondent. With this understanding of the statute in mind, we apply § 2000a–3(c)'s 30–day state notice requirement to the factual circumstances of each defendant.

Defendant Shell was named as a respondent in plaintiff Hill's IDHR charge on February 24, 1998, and not named as a defendant in this lawsuit until September 16, 1998. Plaintiffs clearly satisfied the 30–day requirement with respect to Shell.

■ Defendant Equilon was joined as a defendant in this lawsuit on September 23, 1998, but not named as a respondent in an IDHR charge until December 10, 1998. On or after January 1, 1998, Equilon acquired from Shell ownership of all of its 8,500 stations located throughout the United States. (Equilon br. at 3) Plaintiffs' first amended complaint, filed on September 23, 1998, joined Equilon as a defendant in its capacity as the successor to Shell's stations. Plaintiffs made no allegations of discrimination at Equilon-operated stations until its second amended complaint (filed on January 27, 1999). The February 24, 1998 notice provided the IDHR with the basic facts underlying this action.[6] That submission, along with the December 10,

1998 notice to the IDHR, which formally charged Equilon, are sufficient under § 2000a–3(c). *See Slack v. Havens,* 522 F.2d 1091, 1094–95 (9th Cir.1975) (successor liable under Title VII, even if not named in EEOC charge); *see also EEOC v. Rockwell Intern. Corp.,* 36 F.Supp.2d 1056, 1057–58 (N.D.Ill.1999) (discussing successor liability under civil rights laws).

Defendant Roselle Shell was named as a respondent in plaintiff Parks' IDHR charge on June 11, 1998, but not named as a defendant in this lawsuit until September 23, 1998. Again, the 30–day state notice requirement clearly is satisfied.

■ The five other dealer stations[7] were named as defendants in this lawsuit on September 16, 1998, but not named as respondents in an IDHR charge until December 10, 1998. The February 24, 1998 IDHR charge, however, provided a description of the allegedly discriminatory incidents at those five dealer stations, detailing the location of the five gas stations and the dates on which the alleged incidents occurred. That submission set out the same facts that form the grounds for the present lawsuit. Furthermore, plaintiffs amended their IDHR charges on August 18, 1998, identifying with more specificity the gas stations at which the alleged incidents took place, and filed formal IDHR charges naming the gas stations as respondents on December 10, 1998. On these facts, we find that the IDHR received written notice of the alleged acts or practices occurring at these five gas stations more than 30 days before this lawsuit was filed.

Based on the above analysis we find that plaintiffs have satisfied § 2000a–3(c)'s 30–day state notice requirement with respect to all of the defendants.

---

**6.** Shell responded to Hill's charges in a written submission to the IDHR dated April 15, 1998. In that response, Shell made no disclosures regarding the transfer of ownership to Equilon.

**7.** With respect to the parties newly added in the third and fourth amended complaints, Westchester Shell was named as a respondent in plaintiff Reives' IDHR charge on July 6, 1999, but not named as a defendant in this lawsuit until August 18, 1999.

## B. *Illinois' 180–Day Filing Period*

■ Each defendant moves to dismiss the Title II claims on the grounds that the discriminatory acts alleged against it took place more than 180 days before it was named as a respondent in an IDHR charge. In order to pursue a state administrative claim under Illinois law a complainant must notify the IDHR "[w]ithin 180 days after the date that a civil rights violation allegedly has been committed." 775 ILCS 5/7A–102(A)(1). Defendants argue that § 2000a–3(c)'s state notice requirement incorporates the 180–day limitations period applicable to IDHR claims under Illinois law and plaintiffs did not satisfy the 180–day filing period. Therefore, they failed the jurisdictional requirements of Title II, compelling dismissal of this lawsuit for lack of subject matter jurisdiction.

Plaintiffs argue that the 180–day state administrative filing period is trumped by federal civil rights law. Also, in the alternative, they contend that they have met the 180–day limitations requirement. Because we find that Title II does not incorporate state administrative limitations periods we need not address whether or not plaintiffs have met the IDHR's 180–day filing requirement.

One of the chief concerns behind the Civil Rights Act of 1964 was the need for a national standard of anti-discrimination laws. *See Katzenbach v. McClung,* 379 U.S. 294, 301, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (racial discrimination is "not merely a state or regional problem but ... one of national scope"); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 253, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (racially "exclusionary practices were found to be nationwide"); *see also Wilson v. Garcia,* 471 U.S. 261, 275, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (stressing the "federal interests in uniformity, certainty, and the minimization of unnecessary litigation" behind the 1964 Act). In passing the 1964

Act, Congress saw that "national legislation is required to meet a national need," H.R. No. 914, 1964 U.S.C.C.A.N. 2391, 2393; *see* Sen. R. 872, 1964 U.S.C.C.A.N. 2355, 2368 (discrimination in public accommodations is a problem "national in scope requiring Federal legislation"). Mindful of these underpinnings of the 1964 Act, courts have protected the Act from being unduly frustrated by state procedural laws.

For example, the Supreme Court consistently has rejected the applicability of state administrative limitations periods to federal civil rights claims. In *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 758–65, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979), the Court applied a provision in the ADEA that contained a state notice requirement similar to § 2000a–3(c).[8] The defendants in that case argued that since plaintiff had not filed a state action within the 120 days allotted by Iowa law, his ADEA claim was jurisdictionally barred. *Id.* at 758–59, 99 S.Ct. 2066. The Supreme Court disagreed: "There is no requirement that, in order to commence state proceedings and thereby preserve federal rights, the grievant must file with the State within whatever time limits are specified by state law." *Id.* at 759, 99 S.Ct. 2066. Examining both the ADEA provision and a nearly identical provision of Title VII, the Court held that "Congress did not intend to foreclose federal relief simply because state relief was also foreclosed" by state administrative statutes of limitation. *Id.* at 761, 99 S.Ct. 2066; *see also Burnett v. Grattan,* 468 U.S. 42, 53–55, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984) (six-month limitations period for filing administrative charge under Iowa law does not apply to federal claims under 42 U.S.C. §§ 1981, 1983, and 1985); *Felder v. Casey,* 487 U.S. 131, 152–53, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (Section 1983 trumps state law limitations period).

---

**8.** Section 14(b) of the ADEA provides that "no suit may be brought ... before the expiration of sixty days after proceedings have been commenced under the State law." 29 U.S.C. § 633(b).

The Seventh Circuit also has held that state administrative filing deadlines will not be applied to frustrate federal civil rights proceedings. In *Anderson v. Illinois Tool Works, Inc.*, 753 F.2d 622, 624–26 (7th Cir.1985), another lawsuit interpreting the ADEA's state notice requirement, the Seventh Circuit addressed the issue whether a plaintiff must satisfy the IDHR's 180–day statute of limitations in order to make an extended statutory filing period applicable to his EEOC charge. The court expressly followed *Oscar Mayer* and held that the ADEA's state notice requirement does not require a plaintiff to commence state administrative proceedings within the time limits specified by state law. *Id.* at 626. Therefore, plaintiff's right to file federal EEOC proceedings was not affected by whether he met the IDHR's 180–day filing period for state claims. *Id.*

Contrary to defendants' contentions, courts in this circuit have not incorporated the IDHR's 180–day limitations period into Title II. In *Stearnes*, 3 F.3d at 1144–45, the court simply held that a plaintiff must give notice to the IDHR before filing a Title II lawsuit. The court discussed the 180–day limitations period only because the plaintiff claimed that expiration of that period left no viable state agency for him

to notify under § 2000a–3(c). *Id.* Nowhere did the court hold that a Title II lawsuit must be dismissed if the plaintiff did not notify the IDHR within the 180–day period allotted under Illinois law. Nor does *Huggar v. Northwest Airlines Inc.*, 1999 WL 59841 (N.D.Ill. Jan.27, 1999), stand for such a precedent. In *Huggar*, the court held that Title II does not apply to aircraft. *Id.* at *3. Following this holding, the court went on to comment in a footnote that plaintiff's failure to file IDHR charges within 180 days of the alleged incident also warranted dismissal of his Title II claims. *Id.* at *3 n. 7. We place little value on this single footnote, which was unsupported by any discussion of the principles and law described in *Oscar Mayer* and contained no substantive analysis of § 2000a–3(c).[9]

The 30–day state notice provision is an integral part of § 2000a–3(c), but that provision does not import limitations periods on state administrative actions into the federal scheme of Title II. One can imagine a state, intent on foreclosing public accommodations lawsuits, enacting a one-day limitations period on state administrative actions. Under defendants' theory, plaintiffs who do not file state administrative charges within that one-day period would lose their right to pursue Title II

9. In contrast, the court in *Daigle v. Friendly Ice Cream Corp.*, 957 F.Supp. 8 (D.N.H.1997), conducted a cogent and succinct analysis of whether § 2000a–3(c) incorporates state administrative limitations periods. The court in *Daigle* began by holding that § 2000a–3(c) applies to public accommodation claims brought under Title III of the ADA. Proceeding with the § 2000a–3(c) analysis, the court found that the plaintiff had submitted written notice to the state attorney general, but not until more than 16 months after the discriminatory incident. Like Illinois, New Hampshire has a 180–day administrative filing period. Defendant argued that plaintiff's late filing failed to satisfy the jurisdictional prerequisites of § 2000a–3(c). The court rejected that argument:

> [Defendant's] argument overlooks the distinction between, on the one hand, filing a under the New Hampshire law and, on the other, sending notice to the "appropriate authority" to satisfy the section 2000a–3(c)

prerequisite of an ADA claim. The 180–day statute of limitations only applies to the time within which a complaint may be filed under New Hampshire discrimination law. However, in order to satisfy the prerequisites of an ADA claim contained in section 2000a–3(c), a party is not required to file a complaint or to otherwise pursue action under the applicable state anti-discrimination law. Section 2000a–3(c) only requires that notice be given to the "appropriate authority," and giving notice to state authorities is not the same thing as filing a state law. Notice received by an appropriate state authority after a state law has been time barred still may satisfy section 2000a–3(c) because section 2000a–3(c) does not require any to ever be brought.

*Id.* at 11. We similarly find that satisfaction of the IDHR's 180–day statute of limitations is not a condition precedent to filing a Title II claim in federal court.

relief in federal court. Surely, Congress did not intend such a result. *See Wilson,* 471 U.S. at 275, 105 S.Ct. 1938; *Heart of Atlanta Motel,* 379 U.S. at 253, 85 S.Ct. 348. While Illinois may bar a complainant's administrative claim if he fails to file within the IDHR's 180–day limitations period, it cannot strip him of his Title II rights on those grounds.

Because plaintiffs have satisfied § 2000a–3(c)'s 30–day state notice rule, and are not subject to the IDHR's 180–day limitations period, we find that they have met the jurisdictional requirements of Title II. Accordingly, defendants' motions to dismiss the Title II claims for lack of subject matter jurisdiction are denied.

## II. *Allegations of Racial Discrimination*

Defendants move to dismiss Counts I and II for failure to state a claim. Fed. R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency, not the merits, of the action. *Triad Associates, Inc. v. Chicago Housing Authority,* 892 F.2d 583, 586 (7th Cir.1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). Therefore, no claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In order to withstand a motion to dismiss the plaintiffs must allege facts sufficiently setting forth the cause of action. *Gray v. Dane County,* 854 F.2d 179, 182 (7th Cir.1988). However, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985). Of course, all well-pleaded allegations must be taken as true, with all reasonable inferences drawn in plaintiffs' favor. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992).

Defendants argue that plaintiffs fail to state a claim in a variety of respects. They contend that plaintiffs have failed to show 1) a pattern or practice of discrimination, 2) the requisite discriminatory intent, or 3) abrogation of a federally-protected right. We disagree with defendants' arguments and therefore deny their motions to dismiss for failure to state a claim.

### A. *Pattern or Practice of Discrimination*

■ In both Counts I and II, plaintiffs claim that Shell, Equilon and the dealer defendants "have maintained a pattern or practice of requiring African–American customers, but not white customers, to prepay for gas purchases" (cplt, ¶¶ 24, 27). In their briefs, plaintiffs have clarified that they do not bring pattern-or-practice claims against the dealer stations, but only against Shell and Equilon. Therefore, the pattern-or-practice claims against the dealer defendants are dismissed.[10]

Shell and Equilon argue that a pattern-or-practice claim must be supported by allegations that racial discrimination was the defendants' standard operating procedure. *Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (plaintiff has to prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts"). They point out that even though plaintiffs are frequent purchasers of Shell-brand gasoline and engaged in a two-year, five-State testing expedition for discrimination, they could only assert 17 pre-pay incidents at 12 stations. Defendants argue that this is sporadic, not systemic, discrimination, and therefore the specific allegations defeat the generally pleaded pattern-or-practice claim.

We disagree. Our notice pleading requirements do not demand extensive factual support of the allegations. *See Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7th Cir.1999). Defendants'

---

**10.** Insofar as the conduct of the dealer stations is attributable to Shell and Equilon, however, evidence of discriminatory pre-pay incidents at the dealer stations remains relevant.

characterization of the basis of this lawsuit as a two-year testing expedition belittles the extent of the discrimination alleged. It appears that all of the acts complained of occurred on eleven dates, with multiple incidents at different stations occurring on the same date (cplt, ¶ 9) By our count, this amounts to more than one discriminatory incident per day. Furthermore, this case is a purported class action and class discovery may be necessary to determine the viability of the pattern-or-practice allegations. At the motion-to-dismiss stage of the litigation we are satisfied that the pre-pay incidents detailed in plaintiffs' complaint are sufficient to state a pattern-or-practice claim against Shell and Equilon.

### B. *Discriminatory Intent*

■ To state a claim of discrimination under federal law plaintiffs must allege that 1) they are members of a racial minority, 2) defendants intended to discriminate against plaintiffs on the basis of race, and 3) the discrimination concerned an activity protected by the statutes. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996). Defendants challenge plaintiffs' complaint under the second and third prongs of this standard.

■ Some defendants argue that plaintiffs have not alleged discriminatory intent on the part of defendants. This argument requires little analysis. Defendants rely on the absence of any allegations that plaintiffs were referred to in a racially derogatory manner or otherwise were subject to racial animosity. This is of no consequence, for racial epithets are not required to state a claim. Plaintiffs' allegations of unequal treatment are sufficient. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### C. *Violation of Federally Protected Rights*

■ The crux of defendants' Rule 12(b)(6) argument is that plaintiffs have failed to allege violation of any rights protected by federal law. Specifically, defen-

dants argue that even if plaintiffs were required to pre-pay because of their race, such discrimination, though unfortunate, would not be a violation of 42 U.S.C. §§ 1981, 1982, or 2000a. Thus, we are faced with the question whether a gas station's practice of requiring African-American customers to pre-pay for their gasoline purchases, while allowing white customers to pay after pumping gas, is actionable under these federal statutes.

Count I of plaintiffs' complaint is brought under 42 U.S.C. §§ 1981 and 1982. Section 1981 bars discrimination in the making and enforcing of contracts. As amended by the Civil Rights Act of 1991, it provides in relevant part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981. Section 1981 protects against discrimination by nongovernmental entities and has been applied to cover retail transactions. *See* 42 U.S.C. § 1981(c); *Morris*, 89 F.3d at 413. The Civil Rights Act of 1991 added subsection (b), among other provisions, and intended § 1981 to bar racial discrimination in "all phases and incidents of the contractual relationship." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).

Section 1982 bars racial discrimination in transactions involving real or personal property. It states:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. Courts construe § 1982 as coextensive with § 1981. *See, e.g., Runyon v. McCrary,* 427 U.S. 160, 169–74, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Morris,* 89 F.3d at 413.

Relying on *Morris v. Office Max, Inc.,* 89 F.3d 411 (7th Cir.1996), defendants argue that because plaintiffs were admitted into the gas stations and ultimately were able to purchase gas, there has been no tangible deprivation of rights protected by §§ 1981 and 1982.[11] In *Morris,* the store manager called the police to investigate two African–American men shopping at the store who she felt were behaving suspiciously. The police questioned the men, and then apologized and left. *Id.* at 411. The men then sued the store under §§ 1981 and 1982. The district court granted summary judgment in favor of the store and the Seventh Circuit affirmed. The court held that no federally-protected rights were violated because the plaintiffs "were neither denied admittance nor service, nor were they asked to leave the store." *Id.* at 414.

While superficially similar, the circumstances presented in *Morris* differ significantly from the facts alleged in this case. In *Morris,* the manager's actions did not place any special condition on the plaintiffs' contractual relations or right to make purchases. Instead, the *Morris* plaintiffs were allowed to carry out their contract to purchase goods at Office Max under the same terms and conditions as white customers. In this case, however, plaintiffs allege that the racially discriminatory pre-pay requirement adversely affected the basic terms and conditions of their contract to purchase gasoline from Shell-brand stations. The discrimination took place at the point of sale, directly implicating plaintiffs' right to contract and to enjoy "all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.

§ 1981(b); *see Rivers,* 511 U.S. at 302, 114 S.Ct. 1510.

On similar facts, courts across the country and in this district have held that a racially discriminatory pre-pay requirement states a claim under §§ 1981 and 1982. *See Hill v. Amoco Oil Co.,* No. 97–C–7501, slip op. (N.D.Ill. July 20, 1999) (holding that allegations of a racially discriminatory pre-pay requirement at Amoco-brand gas stations states a claim under §§ 1981 and 1982); *Bobbitt v. Rage Inc.,* 19 F.Supp.2d 512, 519 (W.D.N.C.1998) (when restaurant required African–Americans, but not whites, to pre-pay for service it "changed an essential term of the customer/restaurateur contract because of race ... [and] triggered subsection (b) of [Section 1981]").

Furthermore, contrary to defendants' assertions, this is not a case in which plaintiffs merely received poor or delayed service. Cf. *Harrison v. Denny's Restaurant, Inc.,* 1997 WL 227963 (N.D.Cal. Apr.24, 1997); *White v. Denny's Inc.,* 918 F.Supp. 1418, 1423 (D.Colo.1996); *Robertson v. Burger King, Inc.,* 848 F.Supp. 78 (E.D.La.1994). Unlike the slow service cases, plaintiffs in this case allege direct impairment of the terms and conditions of their contractual purchase of gasoline. A pre-pay requirement may well result in slow service, but it also subjects African–American customers to different terms of purchase. This is sufficient to state a claim under §§ 1981 and 1982.

Count II of plaintiffs' complaint sufficiently states a claim for similar reasons. Title II of the Civil Right Act of 1964 bars discrimination in places of public accommodation. The relevant portion of that statute provides:

All persons shall be entitled to the full and equal enjoyment of the goods, ser-

---

**11.** The argument made by defendants, that there is no civil rights violation because plaintiffs ultimately were admitted and served, was raised and rejected by Judge Hart in *McCaleb v. Pizza Hut of America, Inc.,* 28 F.Supp.2d 1043, 1047–48 (N.D.Ill.1998), who observed:

"Defendant ignores that § 1981(b) defines the making and enforcement of contracts as including performance of the contract and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." *Id.* at 1048.

vices, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000a(a). Gas stations are defined as places of public accommodation and are governed by the statute. 42 U.S.C. § 2000a(b)(2).

Requiring plaintiffs to pre-pay for their gasoline purchases, while white customers are allowed to post-pay, abridges plaintiffs' Title II rights to the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations" of Shell-brand gas stations. In similar contexts, courts have held that pre-payment policies, if proved, violate Title II. *See Bobbitt,* 19 F.Supp.2d at 522; *see also Stevens v. Steak n Shake, Inc.,* 35 F.Supp.2d 882, 887–890 (M.D.Fla.1998) (discriminatory pre-pay policy would violate analogous Florida law).

Plaintiffs' allegations of racially discriminatory pre-payment at Shell-brand stations are sufficient to state a claim under §§ 1981 and 1982 and under Title II. Both Count I and Count II pass the test of Rule 12(b)(6).

### III. *Vicarious Liability of Shell and Equilon*

Plaintiffs' complaint alleges that Shell and Equilon are liable for the discriminatory practices of the dealer stations (cplt, ¶ 10). Such liability exists, plaintiffs allege, because "Shell and Equilon operate as principals to their contract dealers (or alternatively conferred apparent authority on contract dealers to operate as agents)" (cplt, ¶ 10). Shell and Equilon deny that they are liable for the alleged discriminatory acts of the dealer stations and move to dismiss plaintiffs' claims insofar as they allege such vicarious liability.

■ Plaintiffs proceed under the agency law theory of vicarious liability. They claim that the dealer stations are agents of Shell and Equilon under the dealer agreement and lease and therefore, pursuant to either actual or apparent authority, Shell and Equilon are liable for the dealer stations' misconduct (pl. br. at 4). Defendants counter that liability under §§ 1981 and 1982 cannot be imposed vicariously. This argument, however, is based on a misreading of the Supreme Court's decision in *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Contrary to defendants' characterization of that case, the Supreme Court did not hold that civil rights liability could never be imposed vicariously. Instead, the Court simply found that the facts presented in that case did not establish the existence of an agency relationship. *Id.* at 391–95, 102 S.Ct. 3141. In fact, Justice O'Connor, concurring, emphasized that "nothing in the Court's opinion prevents the respondents from litigating the question of the employer's liability under § 1981 by attempting to prove the traditional elements of *respondeat superior.*" *Id.* at 404, 102 S.Ct. 3141. Courts in this circuit have recognized that continuing viability of vicarious liability in the civil rights context. *See Malone v. Schenk,* 638 F.Supp. 423, 425 (C.D.Ill.1985) (collecting cases).

What constitutes an agency relationship is a matter of hornbook law: "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958); *General Bldg. Contractors,* 458 U.S. at 392, 102 S.Ct. 3141. Whether an agency relationship exists, however, is a factual inquiry. *See Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 864 (7th Cir.1998); *Goldstick v. ICM Realty,* 788 F.2d 456, 460 (7th Cir.1986). Such inquiries are best left for resolution at the summary judgment or trial stage of litigation.

■ Plaintiffs invite us to decide the issue solely on the language of the agreement and lease, which (as plaintiffs repeatedly point out) state that they do not

create an agency relationship. Contractual language, however, is often self-serving and is not dispositive of the issue. *See Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 786 (3d Cir.1978) (that "agreement expressly denies the existence of an agency relationship is not in itself determinative of the matter"); *Northern v. McGraw–Edison Co.,* 542 F.2d 1336, 1343 n. 7 (8th Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977).[12] That is why discovery into the actual nature of the relationship is needed.[13] The evidence may well show that no agency relationship exists between Shell and Equilon on one hand and the dealer stations on the other. The allegations, however, are sufficient to state a claim. Plaintiffs' complaint, alleging liability on the part of Shell and Equilon for the dealer stations' misconduct, withstands defendants' motions to dismiss.

## IV. *Mootness Issues*

█ Two dealer defendants move to dismiss plaintiffs' claims for injunctive relief on mootness grounds. We note that neither of these defendants argues that plaintiffs' claims for money damages, declaratory relief, and attorneys' fees are moot. Our ruling on the mootness issues, therefore, has no bearing on the other forms of relief sought from these defendants.

First, defendant Peterson Western Shell states that its former owner, Mohammed Anjad Umer, sold the gas station and therefore no injunctive relief may be obtained from him.[14] Umer attached an affidavit to his motion to dismiss attesting that he sold all of the assets relating to the operation of his Shell station in November 1997.[15] Since plaintiffs are not subject to future injury by Umer, the claims for injunctive relief against him are dismissed.[16] *See O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

Second, defendant Roselle Shell argues that plaintiffs' plea for injunctive relief is moot because there are no allegations that plaintiffs will be subject to a discriminatory pre-pay requirement in future visits to that station. Roselle Shell relies on the basic proposition, articulated in *City of Los Angeles v. Lyons,* 461 U.S. 95, 102(983), 103 S.Ct. 1660, 75 L.Ed.2d 675, that a mere allegation of "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* (*quoting O'Shea,* 414 U.S. at 495–96, 94 S.Ct. 669). However, plaintiffs in this case do not simply allege past misconduct. They specifically allege that the defendants continue to violate §§ 1981 and 1982 (cplt, ¶ 24) and Title II (cplt, ¶ 27). Furthermore, plaintiffs' allegations do not rest on a single pre-pay incident in the

**12.** Plaintiffs point out that the language of the agreement and lease is not as one-sided on this issue as defendants suggest. The agreements direct dealer stations to maintain Shell corporate standards and provide that Shell or Equilon may terminate any dealer station found to have violated the law. (*See* Dealer Agreement ¶¶ 2, 18.1(c)(11); Lease ¶ 10.1(c)(10))

**13.** Notably, the cases cited by defendants in support of their argument were all decided on summary judgment or post-trial motions. *See, e.g., Smith v. Cities Service Oil Co.,* 346 F.2d 349, 352 (7th Cir.1965); *Oberlin v. Marlin American Corp.,* 596 F.2d 1322, 1326–27 (7th Cir.1979). These decisions illustrate the need to conduct discovery into the precise nature of the alleged agency relationship.

Like those courts, we require more evidence than is available on a motion to dismiss before we are able to resolve the issue.

**14.** Umer is named as a defendant "individually and d/b/a Peterson Western Shell."

**15.** Umer has filed a motion to dismiss or, alternatively, for summary judgment.

**16.** The pre-pay incidents suffered by plaintiff Hill at the Peterson Western Shell station occurred on August 3, and September 7, 1997, before Umer sold the station. Therefore, Umer remains a defendant with respect to Hill's individual claims against him, and as to the pattern-or-practice claim against Shell and Equilon, irrespective of our finding that the injunctive claims against him are moot.

past, but rather detail numerous occasions of discriminatory pre-payment. *See Naiman v. New York University*, 1997 WL 249970, at *4–5 (S.D.N.Y. May 13, 1997) (distinguishing single incident cases from multiple incident cases with respect to injunctive relief). The allegations set forth support a cause of action for injunctive relief against Roselle Shell.

Therefore, Umer's motion to dismiss the injunctive claims against him on mootness grounds is granted. Defendant Roselle Shell's motion to dismiss the injunctive claims is denied.

## V. *Standing and Misjoinder Issues*

■ Finally, we address the arguments of one dealer defendant regarding lack of standing and misjoinder. Specifically, defendant Roselle Shell claims that because plaintiffs Hill and Lawson had no dealings with Roselle Shell, they lack standing to sue it.[17] Alternatively, Roselle Shell argues that it has been misjoined in this lawsuit because, absent any allegations of joint conduct or conspiracy, plaintiffs cannot show that the misconduct of the dealer defendants was part of the "same transaction, occurrence, or series of transactions or occurrences." Fed.R.Civ.P. 20(a).

Roselle Shell misconstrues the nature of the claims alleged against it. Neither Hill nor Lawson allege any individual claims against Roselle Shell. Furthermore, no class pattern-or-practice allegations are made against Roselle Shell or any of the dealer defendants. Roselle Shell is a defendant in this lawsuit for two reasons. First, plaintiff Parks sues Roselle Shell for the June 11, 1998 discriminatory pre-pay incident. Second, plaintiffs sue the dealer defendants (and Shell and Equilon) for declaratory relief, seeking to construe the agreement and lease. Roselle Shell and the other dealer defendants are properly joined under these circumstances. *See* 7 Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Proce-*

*dure*, § 1616 (1995) ("As in other contexts, courts in actions seeking declaratory relief should attempt to join absentees whose joinder is feasible whenever their interests may be affected by the outcome or their presence is needed to adjudicate the dispute effectively.") A declaration on how the agreement and lease shall be construed will affect, and possibly impair, the rights of the dealer defendants. *See* U.S. ex rel. *Hall v. Tribal Development Corp.*, 100 F.3d 476, 479–80 (7th Cir.1996); Fed. R.Civ.P. 19.

We acknowledge Roselle Shell's arguments regarding the risk of prejudice to a sole gas station resulting from defending in this purported class action. As plaintiffs concede, if discovery reveals no connection between the dealer defendants' misconduct and Shell and Equilon, a re-evaluation of misjoinder and severance issues may be required. At this point, however, we deny Roselle Shell's motions to dismiss and to sever.

## CONCLUSION

For the reasons stated above, all of defendants' motions to dismiss are denied except as follows: claims seeking injunctive relief from defendant Umer are dismissed as moot; pattern-or-practice claims alleged against the dealer defendants are dismissed; and insofar as the complaint raises any class allegations against the dealer defendants for relief other than a declaratory judgment, those class allegations are dismissed.

---

**17.** Though this argument is raised in a motion to dismiss and cast as a challenge to standing, it is more appropriately characterized as an argument against certifying a defendant class and, therefore, is better raised at the class certification stage.